at all. Arguments not to exceed 15 minutes per side. 15 minutes to be shared, I'm sorry, 15 minutes for appellant, 15 minutes to be shared by a police. And we got Mr. Vining Good afternoon. My name is Guy Vining. I'm the second successor trustee of the MTG case. The eponymous counsel for this case. Yes, what happened as I understand it, is that when the second successor, first successor trustee was appointed by the local USTO, the creditors were up in arms because they were so distressed and disappointed with the fraud on the court that was discovered from the first one. So they were looking for somebody that had absolute independence. Me. I'm happy to be here today and I think probably my friends on the other side are happy to be here because this fraud was discovered 26 years ago. I can't believe this case is coming to us, you know, 20 odd years after some of the relevant events. I'm an older man. I was a young guy when we started. You and me both. And it took seven years for the bankruptcy court to decide cross motions for summary judgment that were argued in 2015. So I don't know, you know, I'm not picking any judges. I never do. It's a fool's errand. No argument there, sir. But the point is, you know, maybe they're just crushed with work and I think that could be the case too. But so we take umbrage and actually my brief can tell the story better than I can tell you. I mean, we do know the sordid background of some of this stuff. So you don't have to recite all that history. I'm curious. I understand one of your arguments in your brief to be that these three orders for commercia that were entered kind of after the agreement between Mr. Taun and but before the bankruptcy court discovered the fraud on the court, right? These three commercia orders. If we were to agree with you that they were void ab initio, like, what would happen under the bankruptcy statute? Like, if you can point to statutory provisions that would show us. Because it strikes me that, like, commercia still has a secured claim. And I'm just curious. Give me the play by play if this were actually void, if these orders were void ab initio. Well, the easiest thing I can remember, Your Honor, is this. We were denied relief for our post-petition claim under section 549 of the... The avoidance claim. The avoidance. And the only reason we were denied that, as I understand it, is because the second line of the by the code or by the court. And so if that was avoided, it would also mean there's another section that's a little further in. I think it's 522 that says that when the avoided property comes back into the estate, it comes free and clear of any lien. So my understanding would be that money would come in. It would be free and clear of Comerica's lien. And they in turn would take under the ultimate distribution along with the other unsecured creditors. So why wouldn't it come, like, if it were avoidable, why wouldn't it then come under section 502? Which specifically says, like, if you have a claim arising from the recovery of property under what is 550 and enforcing your 549 claim, right? It says it should be, quote, the same as if such claim had arisen before the date of the filing of the petition. So wouldn't we just be, like, back? I mean, this would be, like, Ferris Bueller, like, we're back, like, right before the petition files. And then, you know, they would still have their claim and ask for it to be allowed. And we would just do this whole thing over again. Well, I don't think so. And the other part of it is that... People know Ferris Bueller. I don't think you got the right movie. Oh, yeah. Sorry. Groundhog Day. Groundhog Day. Sorry. These colleagues, they keep me in line. Groundhog Day. Sorry. Yeah. Sorry. It's also Comerica, my friend from Ohio. Sorry. It's quite all right. No, it comes into it. And then the other statute says it comes back free and clear of any lien. There's a small J on the end, but I forget the number. But it's in our briefing. So we think, you know, it would come back, it would be subject to general distribution along with administrative expenses. Now, in the bankruptcy court, you know, I think our other argument would be that because of the unclean hands, they ought not to be able to be entitled for their lien to arise again. The idea being, and of course, that's the other part of the case, did Comerica, through attorneys, participate in the fraud of the court so that they can be liable? We say yes. There's a lot of evidence of that. But the bankruptcy judge didn't get into that part of it. He just sort of divined and said, you know, it's a corporation, it's not a human being, and it's certainly not a lawyer. So therefore, Comerica doesn't have any liability. In our appellate brief, we cited a number of cases that would lead to liability. So, for instance, just on general agency principles under what we call the illegal fee agreement, it's patently clear that Charles Taunt was sort of a pretend trustee, but he was taking all of his orders directly from Mr. Hertzberg and also from Mr. Lyons, who was the vice president of asset collection. And so we think that because those activities were being directed, they were actually being directed by Comerica. For instance, one of the things I wanted to talk about is we provided evidence that in the bankruptcy court and the district court overlooked much of this stuff, but there was testimony right from people that were there. Even Mr. Hertzberg indicated that, you know, if you think that we weren't directing, we weren't controlling, I forget his expression, it was somewhat vulgar, but you need to get your mind checked or something like that, because the inference being and what he's saying is we were given the directions and we had this guy under our thumb. Mr. Ball, who worked for Mr. Taunt, a young attorney, he testified that they didn't have discretion, they were being micromanaged by Comerica. And of course, by the way, you know, there is a case law that an attorney with authority to bind his client does bind his client. So there's no question that Mr. Hertzberg and the attorneys from Miller and Canfield that were involved in this all had the authority to, in fact, that was their marching orders. Go in, make sure that the estate never gets any money so that they can launch any legal offensive against us. And part of that is we talk in our brief about Section 541. If it was true, I mean, if an independent trustee really determined that the value of Comerica's lien exceeded the value of the assets, then the trustee is under a duty under the USTO has a policy, you can't administer their case. There's no estate to, there's no benefit to the estate. And so therefore, you've got to file a motion to, you know, abandon the assets and then let the parties fight it out. Take possession. Let go of the stay, right? Yes. And that would be, you know, if you think about it, that would be fair, too. Because then the shareholders and the unsecured creditors would be able to hire independent counsel. They wouldn't be stuck with Charles Taunt, who we know, and I hate to say this stuff, I mean, it's really hurtful, but the guy was dirty. And the deal with Hertzberg was dirty that they set up. But if it was all abandoned, you know, then it would end up in the Macomb County Circuit Court or the Oakland County Circuit Court. MTG could have their day in court because they could hire their own independent lawyer and they could fight it out forever. And actually, it would certainly be quicker than where we're at today. How do we make of the fact that the bankruptcy court, you know, kind of looked at the evidence you put before it and the evidence of fraud and then the transactions that went on and ultimately determined that there really wasn't harm to the estate? Like, what is our role in reviewing that determination? Well, you know, that's a nice excuse, but we'll never know, will we? We don't know what would have happened if MTG had a fair trustee. I'll tell you what a fair trustee would do. I know some trustees now. It's hearsay, but what a fair trustee would do under Section 740 of the bankruptcy code, he's got a duty to make investigations. Now, at the time of the conversion to Chapter 7, there was $60,000 in the estate and Comerica was worried that that money could be used for investigations. Back then, that was a lot of money. So a fair trustee would say, I'm going to get some CPAs on board, I'm going to have them point out what business records I need, and then I'm going to get my own associates to get those records, and then I'm going to hire somebody that really understands this. Because I don't think Charles Taunt, I don't think most attorneys in Detroit back then had a good grounding in so-called lender liability, right? But certainly in Chicago, you could find attorneys that could give advice. You know, the trustee can hire other special counsel to give advice and to do investigations. If it was determined by an independent trustee that, yes, that's right, there is a case, then what they would do, they would file the case. And many times, these cases, if they're adequately funded, they end up in what they call a carve-out. In other words, to get to a settlement, the secured creditor gives up a percentage of its money that it will receive, and that will be distributed to the unsecured creditors. Of course, it could be, on the other hand, an independent trustee might have determined that, no, indeed, you couldn't win a case like this, or it's less than 50-50. And then the trustee would have to say, well, I think I've got to abandon this property under Section 541. Sir, I just want to let you know, you are getting toward the end of your time. Well, it actually just went red. Why don't you take a minute or two and just sort of summarize your argument for us? I think we wrote an excellent summary in our brief, Your Honor. And so the point of it is that a couple things. Number one, these opinions from the lower court send the complete wrong message to the bankruptcy bar and other attorneys. They equate this case with lesser cases such as, for instance, the trustee hires an attorney and it turns out the attorney has a small conflict and they have to remove him. So that's one thing. Or an accountant. And there are a lot of cases like that. And this limited relief is called nuanced release. You take out the bad guy. But this is a case, and I don't know, maybe I just couldn't make the point with the judges, but this is a case in which, and I've not been able to find one, where the actual trustee, the actual fiduciary, the guy that is supposed to be like Caesar's wife, he's the one that committed the fraud and he's the one involved in it. And so I don't think you give piecemeal nuanced relief. I think you have to deny all relief to them. And that's under the well-known principles in the cases that we cited. Hazel versus Atlas. There's a good First Circuit Court opinion where the judges there kind of decided, like, why would we even want to listen to somebody's defenses when we know they're a crook? You know? All right. Well, I think the two minutes has expired. I appreciate it. We appreciate your argument, sir. And we're going to carefully consider that along with your brief. And now we're going to hear from the squad that is opposite you. I'm going to need therapy because, Judge, you brought up smoking. And now I'm thinking about it. I've got to get a cigar. Oh, well, that's not as bad as cigarettes, I guess. All right, sir. Thank you. Good afternoon, and may it please the Court. My name is Trent Collier, and I represent Plunkett Cooney. I drew the short straw, and I have only three minutes here. I'm going to use them the best I can. I want to answer any questions that the Court may have and really address two main issues. I think when you look at the claims against Plunkett Cooney, they can be broken down into two main disputes. The one main dispute is, what is the effect of vacating orders? I think the issue here is that the trustee is relying on the wrong body of law. The trustee's arguments are based on a case out of the Ninth Circuit called Schwartz, and in Easley v. Pettibone, which is a 1993 case cited in our brief, this Court disagreed with Schwartz. So that's not a valid basis for their argument. And current law has changed. In the case of U.S. aid funds v. Espinoza, the United States Supreme Court said, generally, in order to void an order completely, it has to be entered without jurisdiction or a violation of due process. In Rule 60B, when we talk about how you can get relief from a judgment, for example, is a different category than obtained by fraud. So it's suggesting that those two are not the same thing. The judgment is void is category four. Obtained by fraud is category three. They're not the same thing. I'm supporting your point. I guess what I'm saying is that these two categories go to whether it's void rather than obtained by fraud. Can I ask you the same question that I asked your friend? If these were these three transactions, or if you want to take the claim allowance, which was what your friend addressed, were indeed, whether it was avoidable under 549, what would actually happen now? One thing that's important there is Section 362D of the Bankruptcy Code allows the Bankruptcy to annul violations of the stay. The Bankruptcy Court has the power to change history. Like after the facts say it was fine that there was a violation. Exactly, yes. That would apply there. For the other two orders, I think you have to look at, and I am almost out of time, I think you have to look at this body of case law, which says, even though we're not giving effect to it now, it's still an historical fact, which would go to the 549 claim and to the conversion claims. I'm out of time. Thank you, sir. I appreciate the self-regulation. I feel like I have to run up here quickly. It's okay that you mispronounced Comerica since they were bought out by Ohio Bank two weeks ago. That might be getting off on the wrong foot here, sir. I do want to bring the Court's attention to the record. I only have a couple of minutes. The sites to the record are nothing short of reckless. Taunt failed to disclose the fee agreement. That's what he did. That's what the record reflects. He didn't hide it, actually. The order in which the Comerica property was disposed of specifically referred to it. It was found to be fraud on the court. Using his broad discretion, Judge Tucker awarded relief. What he determined in his discretion to be relief. I want to answer your- On that point of relief and the bankruptcy court's discretion to fashion the relief for fraud on the court, where do we find that discretion? Is it statutory discretion? Is it just the Court's inherent equitable authority? There's no fraud on the court statute. Where do we ground that? You guys all say that. I think it rests in the judge's discretion. It actually goes to the earlier question that you asked, which I think is right on. If I can try to answer them both at the same time. What Judge Tucker ... Judge Tucker actually goes back before Judge Tucker. What the bankruptcy court did was void the orders at the time that it determined that there was fraud on the court and allowed the estate to pursue the claim that it asserted it had at the time. At no time was Comerica's lien questioned, nor was the amount of its lien questioned. That goes to your point. The claim, it will, was never questioned. The question was, was there an offset right against that claim, that being the lender liability claim? Anne Taunt settled the lender liability claim for $10,000. You think, well, that's not much in the way of a settlement. Except Michigan has a statute of frauds that deals with financial institutions that are not enforceable unless they're in writing. That lender liability claim rested on the existence of some promise, which was never in writing. The rub here, and this is the point that I wanted to make, the rub is not that Judge Tucker or Judge Berg failed to give the estate relief for the fraud on the court that occurred. The rub here is that the spent two decades, and it's not all their fault that it was two decades. Judge Tucker's opinion took forever. On the other hand, it was 420 some pages, so it took forever, right? But took two decades pursuing a lender liability claim, which never existed and never could have existed. Because on day one, the estate, the president should have had a piece of paper that said, you promised me that you would continue to extend credit while we went through the sale process, which was the subject of the lender liability claim, a promise that was made by Comerica. The settlement of that lender liability claim you're talking about, like the August 29th, 1996, the Comerica settlement order. Do you know, and maybe you have a group here, where in the record that is, because what is cited in the cases actually gives us the Becker settlement order? Oh, I apologize, but I don't know off the top of my head, but I will get it for you. Okay. Yeah, that order was vacated to allow the estate to pursue that lender liability claim. Okay. If anybody knows the Comerica settlement went on. The last point that I wanted to make is this agency argument, which is new, it wasn't made below, but the word agent is the word affiliate. The guy that showed up and cut my lawn yesterday was my agent. And the scope of his agency was cut my lawn. Okay. That doesn't give him the power to bind me to contracts with respect to cutting down my trees. But more importantly, and the real fallacy of this argument is that it rests on the premise that there was a duty that Comerica had to disclose to the state that it somehow transferred to an agent to do. But it wasn't Comerica's obligation to disclose. Comerica never had that duty. It was Taunt that had that duty. And Comerica didn't have it. And Comerica's attorneys didn't have it either. Miller Canfield was their attorneys at the time. You're going to have to wrap it up. And I will. And they settled. And there was a settlement payment against Miller Canfield's attorney. Thank you. And thank you for your time. I talked as quick as I could. All right. Next. Good afternoon, your honors. Courtney Krause appearing on behalf of Sherry Taunt as personal representative of the estate of Charles Taunt and Charles L. Taunt and Associates. In answer to your honors question, the Comerica settlement agreement was in 2007. And a review of the district court's opinion and order which affirmed the bankruptcy court's decision noted that had Vining taken issue with that particular order at that time, he could have done so. And that was back in 2007. And that was one of the reasons why the district court affirmed the bankruptcy court's decision in that regard. Also, to circle back to some references made by my other counsel, really this case comes down to whether or not Judge Tucker properly exercised his authority under Section 105. And one of the foremost considerations when doing so is the benefit to the estate. And while I have not been a part of this case from day one, many of my colleagues have. And over the past 20 years, we have not seen over the course of the entire court record, which consists of tens of thousands of pages of documents, what or when the trustee articulated any actual benefit to the estate that this litigation has produced. We've heard a lot of legal theories, a lot of speculation. And even when your honors just recently asked the trustee to respond to that question, there was no direct substantive response. So I'm happy to answer any questions. But on behalf of the estate, I would ask that your honors affirm the decision of the district court in this matter. Very well. Thank you. Appreciate your time up there. Good afternoon. Jeffrey Frank on behalf of American Casualty Company, Redding, Pennsylvania. We are the surety who wrote the trustee bond for Mr. Taunt. And when this case started, I did have hair. You've heard the arguments about the crux of the case. So I want to shift gears just to the surety-related issues. A surety is entitled to assert any defense of its principle. The surety's liability is limited to that of its principle. And the parties, specifically Taunt and Plunk Cootie, have really briefed and addressed these issues in detail. We would adopt their arguments as far as the surety's defenses. But there are two very surety-specific issues that I want to address. The trustee has persisted in this quest for punitive damages and sanction in his brief, in his reply brief. And the court's already denied them, the bankruptcy court and the district court, which was well within their discretion. But even in a world where he would be entitled to sanctions, which we don't believe that world exists, the surety can't be liable for punitive damages under any circumstances. And that's because the surety is not the wrongdoer in this situation. There's no bad behavior by a surety to deter. The surety's only involved in this case by virtue of issuing its bond, which certainly can't be deemed to be a bad act. The second thing is that the in his brief on appeal has asked the court to rule, and this is a quote, that all defendants intentionally committed fraud on the court. And I go back to the same argument. I can't imagine that he intends that to apply to the surety as well. Again, because we're only a party to this proceeding because of the issuance of the bond. And I don't think there's any circumstance under which a surety can be determined to have intentionally committed fraud on the court. Something that Mr. Binding said jumped out at me. And he said, had a neutral trustee looked at this and undertaken analysis on this lender liability claim 20-some odd years ago, we would have really known where this case would have gone. And what no one's really touched on is the fact that there was a first successor trustee. His name was Doug Elman. And Mr. Elman, while serving as the successor trustee, enlisted an expert opinion from Professor J.J. White at University of Michigan's law school. And Professor White issued an opinion, March 19, 2001, and stated, and this is a quote, there's a low probability of success in a lender liability claim against Comerica. That was 24 years ago. I think J.J. White had hair then too. He's probably still teaching full time, right? When he taught me in 1991, he didn't have hair then either. Well, and Professor White, a renowned authority in the area, could tell us back in 2001 that there was a lender liability. There was no profanity in that sentence either? We should see the rest of the opinion. But if Professor White can take that position, then we shouldn't be here 20-some odd years later, having litigated the lender liability claim, having given a second successor trustee an opportunity to litigate all these claims, and getting us right back where Professor White told us we'd be in the first place. There's just no viable claim. There's no basis. I don't want to say no harm, no foul, because the court did determine that some attorney fees should be disgorged, and that there should be a small sanction of attorney fees relating to portions of this claim, but the court got it right. I beg the court to affirm the bankruptcy court, and to affirm the district court's affirmation, and bring this to an end before I'm completely bummed. Thank you. Thank you, Frank. We're done? Does he need a rebuttal? No. He's in charge on this. I appreciate it. I appreciate it. It's a big record. Okay. Thank you. Thank you all for your arguments. Case will be submitted. Clerk may adjourn court.